WM. J. JONES AND CO. *v.* UNITED STATES (No. 4651) [1]

---

[1] C. A. D. 453.

United States Court of Customs and Patent Appeals, March 30, 1951

*Altschuler & Morrison (Benj. M. Altschuler* of counsel) for appellant.
*David N. Edelstein,* Assistant Attorney General (*Richard F. Weeks,* special attorney, of counsel), for the United States.

[Oral argument December 6, 1950, by Mr. Altschuler and Mr. Weeks]

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, JOHNSON, and WORLEY, Associate Judges

WORLEY, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court, Third Division, in conformity with its decision, one judge dissenting, C. D. 1247, overruling a protest by appellant against the assessment of duty by the Collector of Customs at the port of Philadelphia upon 35 bales of hops imported from Yugoslavia.

Appellant makes here, as it did in the Customs Court, two contentions; namely, that the involved merchandise had become so contaminated with oil during the voyage of importation that it arrived at the port of entry in such a wholly commercially worthless condition as to constitute a nonimportation; and alternately, that it arrived in such an adulterated condition as to be wholly unfit for food and thereby became a prohibited importation.

In support of the first contention, the cases of *Lawder* v. *Stone, Collector,* 187 U. S. 281, and *Marriott* v. *Brune,* 9 How. 619, were cited. With respect to the second contention, section 558 of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, is relied on, which, so far as pertinent, reads as follows:

SEC. 558. NO REMISSION OR REFUND AFTER RELEASE OF MERCHANDISE.

(a) No remission, abatement, refund, or drawback of estimated or liquidated duty shall be allowed because of the exportation or destruction of any merchandise after its release from the custody of the Government, except in the following cases:

\* \* \* \* \* \* \*

(2) When prohibited articles have been regularly entered in good faith and are subsequently exported or destroyed pursuant to a law of the United States and under such regulations as the Secretary of the Treasury may prescribe; \* \* \*

At the trial before the Customs Court, the importer (appellant) introduced the testimony of seven witnesses and presented twelve documentary exhibits. No testimony was presented by the Government and no evidence was submitted other than that shown by the official reports forwarded by the collector with the protest.

From an examination of the record it appears that 200 bales of hops, originally from Yugoslavia, arrived at the port of Philadelphia December 31, 1945. The ship was unladen January 2, 1946. The report of the customs inspector disclosed that he identified 35 bales as being "stained" when unladen. There is no dispute but that those bales are the same as the 35 bales here involved. The testimony of a pier supervisor present during the unlading reflects that on that date he noticed "some" of the bales were "stained," and that 45 were set aside.

The official papers show that on January 9, 1946, as a result of a withdrawal for consumption permit filed the day before, the goods were released into the custody of importer's agent. On January 11, 1946, the Reading Railroad executed a receipt for the entire shipment of 200 bales for transshipment to the Anheuser-Busch Brewing Company in St. Louis, Missouri. It was recited on said receipt that 35 bales were "stained with oil." It seems that was the first knowledge importer's agent had that the goods were damaged in any respect. There is nothing in the record to show that the Food and Drug Administration had any knowledge that the involved importation was damaged and no evidence that samples were requested by that agency.

It appears further that six additional bales which were placed in the same railway car with the involved 35 bales also became contaminated en route to St. Louis, but appellant makes no claim for those particular bales.

The car arrived in East St. Louis on or about January 20, 1946, where, upon arrival, the seals were broken by two employees of the Anheuser-Busch Company. One of these was the office manager of the office service department of Anheuser-Busch, the other a laboratory technician employed by that concern. The office manager testified that after the seals on the car in question had been broken

and the doors opened, they noticed an odor of a kerosene type of oil; that after the laboratory technician had taken samples from several of the stained bales, the car was re-routed to their plant in order to make a more thorough inspection. He further testified that on or about January 25, 1946, he again saw the involved merchandise and that all of the bales were stained and bore the same odor; that a sample of the inner lining was taken from one of the bales in order to extract the contaminating oil and that said sample, which was approximately 2½ feet square, yielded two ounces of oil.

It was also shown that the involved hops were tightly packed within a linen lining, covering which was an outside wrapper of very heavy burlap. Upon examination it was found that the linen lining acted much as does a lamp wick, drawing the oil completely around the damaged bales. Additional samples of the hops were taken at random from five or six of the bales for testing purposes. It appears that those samples also carried a very strong odor of kerosene, and that there was a difference in color between the oil-stained hops and those which had not come into actual contact with the oil. The director of the brewery division laboratory of the Anheuser-Busch Company testified that as a result of such contamination by oil, the involved hops were "entirely unfit for brewing beer" because such use "would make the product unpalatable and cause anyone drinking the beer to become nauseated and sick." This testimony was not challenged. Apparently convinced that the involved hops were so contaminated as to preclude their use, the Anheuser-Busch Company rejected the entire shipment of 41 bales.

On behalf of an insurance company, a cargo surveyor inspected the merchandise on January 30, 1946, at St. Louis, and testified that the oil had penetrated the entire 41 bales. After unsuccessful efforts were made to find purchasers in St. Louis, the hops were shipped to a marine salvage firm in New York City. That firm stripped the coverings and segregated the stained from the unstained hops. Additional attempts, all of which proved unsuccessful, were made to find purchasers. Finally, the importer made application to the customs officials for the destruction of said hops under customs supervision, the importer agreeing to bear the expense of said destruction. The official records disclose that they were thus destroyed by burning on July 24, 1946.

In order for appellant to succeed in either of the two contentions raised in the protest, it is necessary for him to overcome the presumption of correctness attaching to the collector's action in assessing the appropriate duty. *United States* v. *Frank P. Dow, Co., Inc.*, 17 C. C. P. A. (Customs) 455, T. D. 43915. Thus, the burden of proof is upon appellant to show by a preponderance of evidence that the involved merchandise arrived in such an adulterated condition as to

constitute a prohibited article within the meaning of section 558, *supra*, or that it was so utterly commercially worthless as to constitute a nonimportation.

As to the first contention, we are in agreement with the holding of the Customs Court's decision in which it is stated:

As to the prohibited merchandise claim, there is no evidence before the court that the goods were ever prohibited by any agency of the Government. On the other hand, the evidence shows that no prohibition order was ever issued. The goods were accepted for entry, a delivery permit for consumption was issued by the customs officials, and the sale of the goods had never been prohibited. In all of the cases cited by plaintiff's counsel, the goods had been declared prohibited by a department of the Government and "subsequently exported or destroyed pursuant to a law of the United States under such regulations as the Secretary of the Treasury may prescribe." * * * Therefore the cases cited are not in point. We find no merit in such claim.

The alternate contention is that the hops arrived in this country in a wholly commercially worthless condition and should have been treated as a nonimportation. In order to obtain relief under the rule laid down in the case of *Lawder* v. *Stone, Collector, supra,* it is incumbent upon the importer to establish by appropriate evidence that the goods at the *time of importation* were wholly worthless, not merely damaged.

In support of that contention, the evidence shows that on December 27, 1945, four days before the importing vessel reached Philadelphia, an oil casualty occurred, the ship's log for that day noting as follows: "Due to heavy rolling of vessel, drums of engine oil No. 4 T/D adrift and punctured, contents probably damaging cargo. Drums relashed and reshored and steps taken to prevent further damage." On being unladen, a pier supervisor for the American Export Lines testified that he reported orally to the chief officer of the importing vessel that a number of bales were stained and was told that there had probably been an oil leak, but the "stained" bales were not opened to determine what, if any damage had been sustained by the hops. No examination of the hops to determine possible damage was made until they reached the Anheuser-Busch Brewing Company, almost three weeks later, where they were rejected as being unfit for the purpose of brewing beer. Furthermore, no formal application was made for their destruction until more than six months after entry and more than five months after release from customs custody. The record clearly shows that the destruction of the hops under customs supervision was done at the request of the importer and at his expense.

Counsel for the Government, in their brief, point out that appellant could have, but did not, avail himself of the remedy by abandonment of the damaged hops within 30 days, as provided for in section 506 (1) of the Tariff Act of 1930 which reads as follows:

SEC. 506. ALLOWANCE FOR ABANDONMENT AND DAMAGE.

Allowance shall be made in the estimation and liquidation of duties under regulations prescribed by the Secretary of the Treasury in the following cases:

(1) Abandonment Within Thirty Days.—Where the importer abandons to the United States, within thirty days after entry in the case of merchandise not sent to the appraiser's stores for examination, or within thirty days after the release of the examination packages or quantities of merchandise in the case of merchandise sent to the appraiser's stores for examination, any imported merchandise representing 5 per centum or more of the total value of all the merchandise of the same class or kind entered in the invoice in which the item appears, and delivers, within the applicable thirty-day period, the portion so abandoned to such place as the collector directs unless the collector is satisfied that the merchandise is so far destroyed as to be nondeliverable;

A careful examination of the testimony of appellant's witnesses fails to convince us, as it failed to convince the majority of the trial court, that appellant has offered sufficient evidence to overcome the presumption of correctness attaching to the collector's action in assessing the proper duty. *United States* v. *Frank P. Dow, Co., Inc., supra.*

In the majority decision, the Customs Court stated:

All the court has before it in this case is a mere inference—a probable conclusion toward which known facts, statements, or admissions point—but which does not establish that the hops within the bales were so far destroyed at the point of unlading that such destruction amounted to a non-importation of the goods. The court may order the collector to refund the duties collected only when the importer has established by a preponderance of evidence that the merchandise was so far destroyed at the time of unlading that such destruction amounted to a nonimportation. A fair inference from the evidence adduced that the bales upon unlading might have been contaminated with oil is not sufficient to establish that the goods were not merchantable at that time.

For the reasons stated, the judgment of the Customs Court is *affirmed.*

O'CONNELL, Judge, dissenting.

The evidence in this case is clear and convincing that the imported hops were spoiled on the high seas, that they were on arrival unfit for food or for use as an ingredient in the making of a food product, and that they were in a wholly commercially worthless condition.

Under the law the 35 bales of the contaminated hops should have been treated as a non-importation of adulterated food which was thereafter not dutiable. The Supreme Court of the United States has consistently recognized and applied the doctrine that merchandise such as was imported in the case at bar does not come within the category of goods, wares and merchandise imported into the United States within the meaning of the tariff laws. *Marriott* v. *Brune,* 9 How. 619; *Lawder* v. *Stone,* 187 U. S. 281. Our own Court has likewise approved the same view, as disclosed in the following holding in the case of *United States* v. *Shallus,* 2 Ct. Cust. Appls. 332, 333:[1]

It is equally well established, as a fundamental principle of substantive law, that a cargo or part thereof so far destroyed as to become of no commercial value

[1] T. D. 32074 (21 Treas. Dec. 662)

at the time the importation is brought within the customs district is not, as to the destroyed portion, deemed an "importation of merchandise" within the tariff laws of the United States, and therefore no duty accrues thereupon or can be collected therefor. *Lawder* v. *Stone* (187 U. S. 281); *Stone* v. *Shallus* (143 Fed. Rep. 486); *United States* v. *Habicht* (1 Ct. Cust. Appls. 53); *Marriott* v. *Brune* (9 How. 619).

Appellant has been assessed with a large amount of duty on merchandise which never entered the commerce of the country and under circumstances which dictate that such duty should be refunded as an inequitable extraction presumably not within the intent of Congress to levy.

The judgment of the United States Customs Court, for the reasons hereinbefore stated, and for the reasons stated in the opinion of Judge Ekwall in the court below, should be reversed.